Staples, J.
The bill is filed by Mary Hunter, executrix of James Hunter, dec’d, against B. B. Vaughan aud others. It alleges that James Hunter, on the 25th July 1862, purchased from Uriah "Wells certain property in the city of Richmond, at the price of $11,580; the first instalment of -which was paid in cash; that previous to this purchase, Wells, the vendor, had executed three deeds of trust upon the property, for 1he purpose of securing the payment of certain debts due the parties respectively named therein; and it was agreed between Hunter and "Wells, that the former should pay these debts; that it was understood that the creditors had agreed to accept payment in Confederate currency; that two of the deeds were paid and satisfied in this way; and the third, for the benefit of the defendant B.B. Vaughan, would also have been satisfied, but for the refusal of Vaughan to receive the Confederate curroncj when tendered to him in December 1862.
The bill further charges that Vaughan knew all the circumstances of the purchase by Hunter; that he became a party to the arrangement, and assented to it; and he ought to be compelled to release the deed of trust held by him, the same having been satisfied by the tender.
These averments constitute the main ground upon which the complainants’ application for relief is founded.
VaughaD, in his answer, admits that Hunter, in the *402 year 1863, requested him to receive payment in Confederate currency, which he declined; but that there was no tender of it, and it was not insisted on by Hunter. He denies that he had any understanding before or after the sale with Hunter or Wells, that Hunter was to pay the debt due to him. He denies that he was a party to the contract of sale, or that he had any knowledge of it until after it was consummated, or that he had at any time agreed to accept payment in Confederate currency. It is true he received the interest in that currency up to January 1863; but it was because he chose to do so, and not because he was bound by any arrangement or promise to that effect.
The auswer having thus positively denied the material allegations of the bill, it devolved upon the complainant to sustain them by two witnesses, or one wituess with corroborating circumstances. The only evidence adduced by complainant is a letter written by Vaughan to Hunter the 1st January 1863, and an affidavit of John G. Hunter, taken without notice to the defendant, and excepted to upon that ground.
The letter is apparently an answer to an inquiry on the part of Hunter, whether Yaughan would consent to receive the jrrincipal of his debt in the then existing currency. Yaughan replied, that he only told Mr. Wells that possibly things might turn out, that he would receive the principal in currency; but he could not speak certainly about the matter. He further says, he has no use for the money, and cannot accept it; that the money was loaned in ordinary times, and that an attempt to force payment in the then existing state of things could not of course be tolerated, and he is sure would not be attempted. This language certainly does not indicate the existence of an agreement to receive Confederate money for the debt. It tends very strongly to show, *403 that Vaughan at least, did not consider that any such , „ , , , , , -arrangement was made, we must then look elsewhere for testimony in support of the bill. Does the x x furnish it, conceding that it is admissible evidence? It does not profess to state facts within the knowledge of the witness; but consists of opinions and inferences deduced by him from the letter already referred to, and the deeds filed in the record. It might be more appropriately considered an argument than a deposition. An answer positive and unequivocal in its terms, cannot be •overthrown by a dozen affidavits of this character.
The Chancery court did not err, therefore, in holding that the allegations of the bill were not sustained by the necessary proofs.
The next objection taken by the appellant, is, that the person acting as substituted trustee was not properly appointed; the appointment being made by the Circuit court of the city of Richmond, instead of the Chancery court. It is true that by the 6th section, chap. 155, Code of 1873, the Chancery court is clothed with exclusive jurisdiction in the enumerated cases in that section, and also all the jurisdiction vested in the Circuit courts of the State under the provisions of chap. 175. Neither the enumerated cases nor the provisous of chapter 175, however, embrace “motions and other matters” cognizable in other Circuit courts of the commonwealth. These last, by the 4th section of chapter 155, belong exclusively to the Circuit court of the city of Richmond, and not to the Chancery court. And it will be seen by reference to the 8th section of chapter 174, Code of 1873, that in any ease in which the appointment of a new trustee is proper by reason of the death, removal or refusal to act of those named in the deed, application for such appointment may be made to the Circuit, Couuty or Corporation court of the county or corporation *404 in which the deed is recorded. These provisions make it very clear that the Circuit court of Richmond is the tribunal for the appointment of trustees in this- and other cases of a similar character. Whether the Chancery court may also exercise jurisdiction in like cases we are not called on to decide.
In regard to the notice, it was properly given to the-personal representative of the grantor in the deed, the personal representative of the trustee who was dead, and to the survivor who had removed beyond the limits of the State. It was not necessary that notice should be given to Hunter or his representative, as he was neither a grantor or grantee, nor a surety or other person intended to be secured by the deed.
The only remaining objection necessary to be considered is, that the legal title was and is in C. Q. Tompkins. In reply to this objection it has been very properly answered by the counsel for the appellee, that the point is for the first time made in this court, and was not suggested in the court below as a difficulty in the way of a sale under the trust deed; that if the objection had been then urged it might have been removed by an examination into the state of the title, or by the execution of a deed of release. But, apart from all this, I think it is very clear that Tompkins had conveyed to Wells long before the sale to Hunter. The recitals in the agreement between Tompkins and-Wells show that it was understood between them a conveyance was to be made to Wells upon the payment of the instalment of $1,750 of the purchase money due the 20th June 1855; and it is manifest from the recitals in the deed from Wells to Hunter, that Wells had not only paid all the purchase money to Tompkins, but had received from him the legal title. And it is equally manifest that the only lien upon the property now prevailing, is that held by the defend *405 ant Yaughan; so that a sale by the trustee under that deed will vest in the purchaser a valid title. If there is any other cloud upon the title, it has been raised by this controversy, and will be removed by its termination, under the decree of the court below. That decree, for the reasons stated, must therefore be affirmed.
The other judges concurred in the opinion of Staples, J.
Decree appirmed.